Sue B. FRANKLIN, et al., Plaintiffs,

v.

FIRST UNION CORPORATION,
et al., Defendants.

No. Civ.A. 3:99CV344.

United States District Court,
E.D. Virginia,
Richmond Division.

Feb. 17, 2000.

Frank Neil Cowan, Cowan & Owen, Everette G. Allen, Jr., Hirschler, Fleischer, Weinberg, Cox, & Allen, David R. Simonsen, Jr., John R. Walk, Hirschler, Fleischer, Weinberg, Cox & Allen, Anne Stuart Hayes, Hirschler, Fleischer, Weinberg, Cox & Allen, Michael Paul Falzone, Hirschler, Fleischer, Weinberg, Cox & Allen, P.C., Richmond, VA, Michael D. Lieder, Eli Gottesdiener, Sprenger & Lang, PLLC, Washington, DC, for Plaintiffs.

Craig Thomas Merritt, Christian & Barton, L.L.P., Michael W. Smith, Christian & Barton, LLP, Paul Wilbur Jacobs, II, Christian & Barton, Richmond, VA, Philip C. Cook, H. Douglas Hinson, Teresa T. Bonder, Alston & Bird, LLP, Washington, DC, Gregory C. Braden, Alston & Bird, LLP, Atlanta, GA, John Henry OBrion, Jr., Mays & Valentine, Richmond, VA, for Defendants.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, Senior District Judge.

This matter is before the Court on the plaintiffs' motions for summary judgment as to Counts I, III, and V and the defendants' motions for summary judgment as to Count I, II, III, and V. For reasons stated below, the Court grants the defendants' motions as to Counts I and II, grants in part and denies in part defendants' motion as to Count III, denies the defendants' motion as to Count V, and denies the plaintiffs' motions as to Counts I, III, and V. Judgment will be entered on behalf of the defendants as to Count I and II and, in part, as to Count III. To the extent that judgment is not entered on behalf of the defendants as to Count III, Count III is still pending, as are Counts IV and V. The Court will address Count IV after the parties argue the cross-motions as to Count IV.

## I. FACTS

### A. The Parties

Sue B. Franklin, Martha E. Merchent, Barbara L. Wright, John T.H. Carpenter, William E. Moore, Jr., Gerald L. Runyan, Carolyn N. Lawrence, Margaret M. Lynch, and Raymond E. Williams, Jr. ("the plaintiffs") are nine former employees of Signet Banking Corporation ("Signet") or its wholly-owned subsidiary, Signet Bank ("Signet Bank"). They filed this action on behalf of themselves and "all others similarly situated," purported to be approximately 5000 Signet Plan participants and beneficiaries. Plaintiffs were among the participants in the Signet 401(k)[1] Plan, called the Signet Banking Corporation Employee Savings Plan, a copy of which is attached as Exhibit 1 to the motion for summary judgment as to Count I filed by plaintiffs (hereinafter referred to as "the Signet Plan" or "the Plan"). The Signet Plan is an "employee pension benefit plan" within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., specifically § 3(2)(A), 29 U.S.C. § 1002(2)(A), and is also a "defined contribution plan" and an "individual account plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). The Signet Plan was maintained by Signet Banking Corporation ("Signet") and was administered primarily through an Administrative Committee ("the Signet Committee"), the members of which were appointed by Signet's Board of Directors, according to the Signet Plan, Background and § 6.1. The Signet Committee served as the Plan Administrator. Signet Plan § 6.1.

The defendants are First Union Corporation ("First Union"), First Union Savings Plan Administration Committee ("First Union Committee"), First Union National Bank ("FUNB"), Capital Management Group ("CMG"), and First Union Corporation Savings Plan ("the First Un-

---

1. These plans are referred to as 401(k) plans because they are described in Section 401(k) of the Internal Revenue Code of 1986, as amended.

ion Plan"). First Union is a bank holding company incorporated under the laws of North Carolina, with its principal place of business in North Carolina. It maintains a 401(k) savings plan, the First Union Plan, for its employees nationwide. First Union is the Plan Sponsor. First Union Committee is the Plan Administrator of the First Union Plan. FUNB is a bank organized under the laws of the United States with its principal place of business in North Carolina. It is a wholly-owned subsidiary of First Union. Capital Management Group is a division of FUNB. These four defendants are referred to herein as the "First Union defendants." The fifth defendant, the First Union Plan, is, like the Signet Plan, an employee pension benefit plan, pursuant to ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), a "defined contribution plan," and an "individual account plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

## B. The Events Underlying the Complaint

Signet, like many other business entities, created the Signet Plan so that those employees who chose to participate could make investments to provide for their own retirement. Signet amended and restated the Signet Plan as of July 1, 1994. As Plan Administrator, the Signet Committee selected the various investment vehicles into which participants could direct their savings for investment. The Committee was charged by the Signet Plan to "select the [Plan's] investment [vehicles] in accordance with ERISA section 404(c) and the regulations thereunder." Signet Plan § 8.3(b). Further, the Signet Plan also provided that "[t]he Committee may add to or reduce the number and type of Investment Funds that will be available for investment in any Plan Year." Signet Plan § 8.3(b).

As of July 1, 1994, the Signet Committee had selected seven investment funds for the Signet Plan. They were: the Signet Common Stock Fund, a Signet-managed stock fund investing in the common stock of Signet; the Vanguard Index 500 Trust Portfolio, a mutual fund non-pro-

prietary to Signet that invested in all of the stocks indexed in the Standard & Poor's ("S & P") 500 Index ("Vanguard"); the American Century/Twentieth Century Ultra Investors Fund, another mutual fund non-proprietary to Signet ("Ultra"); and four Signet-proprietary mutual funds or bank collective investment funds that, as of December 1997, were known as: Virtus Treasury Money Market Fund, Virtus Stable Value Fund, Virtus U.S. Government Securities Fund, and Virtus Style Manager. In March 1995, the Signet Committee authorized investment in a "Special Investment Fund" which was the eighth Signet Plan investment vehicle. This fund was called the Capital One Stock Fund. The seven funds listed above were also listed in the Signet Plan in section 8.3 and all eight funds were listed in the summary plan description ("SPD") of the Signet Plan, attached as Exhibit B to the Complaint.

According to the Complaint, as of December 31, 1997, Signet Plan participants had approximately $250 million in assets invested in the eight different investment vehicles. As of that date, approximately $50 million was invested in the Vanguard and Ultra funds; approximately $50 million was invested in the Capital One Stock Fund; approximately $75 million was invested in the Signet Common Stock Fund, and the remaining $75 million was invested in the four mutual funds proprietary to Signet.

The Signet Plan specifies that "the Company, through action of the Board, reserves the right to amend, modify, suspend, or terminate the Plan." Signet Plan § 9.1. The "Company" is defined as "Signet Banking Corporation and any successor by merger, consolidation or otherwise." Signet Plan § 1.10. Section 6.2 provides that the Signet Committee "shall not have the power to add to, subtract from or modify any of the terms of the Plan." Signet Plan § 6.2.

First Union acquired Signet pursuant to a Merger Agreement executed on July 18,

1997 and consummated on November 28, 1997 ("the Merger Agreement"). Defendant's Summary Judgment Appendix, Tab 2. The Complaint alleges that during the time period between July 18 and November 28, the First Union defendants improperly assumed increasing control over the Signet Plan. Following the consummation of the merger on November 28, the First Union defendants formally took control of the Signet Plan. First Union became the sponsor of the Signet Plan and FUNB became the Signet Plan's trustee. The First Union Committee became the Committee under the Signet Plan. Answer, Para. 8.

The Merger Agreement between Signet and First Union included the following provision:

> As soon as administratively practicable after the [corporate merger] employees of Signet and its Subsidiaries shall be entitled to participate in the pension, benefit, welfare, incentive compensation, vacation, sick pay, fringe benefit, and similar plans of First Union . . . on substantially the same terms and conditions as employees of First Union and its Subsidiaries and until such time as administratively practicable the plans of Signet shall remain in effect without any adverse amendments except as required by law.

Merger Agreement § 6.13(a). The Merger Agreement was approved by both the First Union Board of Directors and the Signet Board of Directors. The minutes of the Signet Board meeting that took place on July 18, 1997 include unanimous approval of the merger and two resolutions that specifically addressed employee benefit matters:

> RESOLVED, that the Boards of Directors of the Company and the Bank hereby approve all of the amendments to the Company's and the Bank's Compensation and Benefits Plans as contemplated by the Merger Agreement and the related disclosure schedules as summarized in the attached term sheets and disclosure schedule sections (the "Employee Benefit Provisions").

> RESOLVED, further, that the Organization and Compensation Committee of the Boards and the Authorized Officers be and hereby are authorized to take all such actions as they deem necessary or appropriate to implement the Employee Benefit Provisions and to communicate such matters to the employees of the Company and the Bank.

Defendants' Summary Judgment Appendix, Tab 7.

Section 5.03(m) of the Merger Agreement is entitled "Employee Benefit Plans." Section 5.03(m)(i) states that Signet's Disclosure Schedule with the same section number—5.03(m)(i):

> contains a complete and accurate list of all existing bonus, incentive, deferred compensation, pension, retirement, profit-sharing, thrift, savings, employee stock ownership, stock bonus, stock purchase, restricted stock, stock option, severance, welfare and fringe benefit plans, employment or severance agreements and all similar practices, policies and arrangements maintained or contributed to by Signet or any of its Subsidiaries. . . .

Merger Agreement § 5.03(m)(i). The Disclosure Schedule entitled Section 5.03(m) includes four pages following the title page, the second of which is entitled "Signet Banking Corporation Employee Benefit and Incentive Plan Listing." The first plan on the list, under the category described as "1. Qualified Plans," is the "Employee Savings Plan." *See* Exhibit D to plaintiffs' reply to defendants' opposition to plaintiffs' motion for partial summary judgment with respect to Count I.

The minutes of the October 14, 1997 meeting of the Organization and Compensation Committee of the Signet Board state: "Mr. Taylor presented Management's recommendation to amend the Employee Savings Plan (the Plan) to simplify plan transition and record keeping requirements, allowing for a smooth transition into the First Union Plan." There were two specific recommended amend-

ments: (1) to amend the Plan to immediately vest all account balances at merger consummation; and (2) to amend the Plan to allow for a November 15, 1997 profit based matching contribution to contributing participants actively at work on October 31, 1997. The Organization and Compensation Committee approved both recommendations. Defendant's Summary Judgment Appendix, Tab 15.

In its October 25, 1997 meeting, the Signet Board approved the two amendments to the Signet Plan, noting "that First Union had requested that Signet implement these amendments prior to plan conversion." Defendants' Summary Judgment Appendix, Tab 9. The two amendments approved at that time are reflected in Amendment 1997–1 to the Signet Plan, dated November 13, 1997, the date of the Signet Board's next meeting. *See* Exhibits E and F to plaintiffs' reply to defendants' opposition to plaintiffs' motion for partial summary judgment with respect to Count I.[2]

First Union also approved the Merger Agreement. The minutes of the special meeting of the First Union Board on July 16, 1997 include the following resolution:

BE IT FURTHER RESOLVED, that the proper officers of the Corporation be, and each of them hereby is, authorized to take, or cause to be taken, any and all action which they may deem necessary or desirable to carry out the purpose and intent of the foregoing resolutions, and to make, execute and deliver, or cause to be made, executed and delivered, all agreements, undertakings, documents, instruments or certificates in the name and on behalf of the Corporation as they may deem necessary or desirable in connection therewith, including, without limitation, articles of merger and certificates of merger, and to perform, or cause to be performed, the obligations of the Corporation under the registration statements or any other agreement or document referred to herein.

Defendant's Summary Judgment Appendix, Tab 8.

On or about December 9, 1997, First Union's Executive Vice President for Human Resources, Donald R. Johnson, signed a document entitled "Amendment 1997–2 to the Signet Banking Corporation Employee Savings Plan," a copy of which is attached as Exhibit 2 to plaintiffs' motion for summary judgment as to Count I (hereinafter referred to as "Amendment 1997–2" or "Merger Amendment"). Among its other provisions, Amendment 1997–2 purportedly authorized the transfer of the Signet Plan's assets outside of the Signet Plan and into four of the seven First Union-proprietary investment vehicles then available under the First Union Plan, effective after December 31, 1997. Amendment 1997–2, Paragraph 13.

On or about December 24, 1997, Benjamin J. Jolley, a First Union employee who was also a member of the First Union Committee, executed a "Written Consent of Member of the Savings Plan Committee of the First Union Corporation Savings Plan and Trust." Exhibit 3 to plaintiffs' motion for summary judgment as to Count I (hereinafter referred to as "Written Consent").

Sometime after November 28, 1997, the date the merger was consummated, a notice was mailed to some participants in the Signet Plan. The notice was sent by first class mail, postage prepaid. Defendants' Summary Judgment Appendix, Tabs 16, 17, and 18. A copy of the notice is at Tab 18.

By January 1, 1998, the assets in the Signet Plan had been transferred to the First Union Plan, pursuant to Paragraph 13 of Amendment 1997–2. There was a

---

**2.** Amendment 1997–1 was signed by an executive vice president of human resources of Signet Banking Corporation on November 13, 1997. Although the title on the top of the first page correctly refers to the document as Amendment 1997–1, the paragraph immediately preceding the signature on page two refers to the document incorrectly as Amendment 1997–2.

"black-out" period between December 23, 1997 and February 17, 1998 during which former Signet Plan participants were unable to change their investment elections under the Signet Plan or the First Union Plan. When the "black-out" period ended, former Signet Plan participants were limited to the First Union-proprietary investment vehicles offered under the First Union Plan.

## C. First Union's Prior Resolutions

Prior to its acquisition of Signet, First Union acquired many other companies, most of them also banks. In 1993, to facilitate the task of merging employee benefit plans of acquired companies, the First Union Board of Directors ("First Union Board") issued a resolution regarding the benefit plans of acquired companies. Defendant's Summary Judgment Appendix, Tab 5, Exhibit A ("1993 Resolution"). The 1993 Resolution states that "certain of such Plans need to be administered, operated, and otherwise dealt with after the Acquired Company that sponsors the Plans is merged into or otherwise acquired by the Corporation." It delegates to the manager of the Human Resources Division the authority to "... administer, operate, amend, and otherwise deal with all such plans of any Acquired Company at such time as the Manager elects to assume such duties with respect to any such Plan or Plans following consummation of the Acquisition relating thereto ..." but also notes that "to the extent the manager does not elect to assume such duties," then the plan shall be administered by the First Union Board, the Human Resources Committee, and/or First Union National Bank, as trustee, depending on how such plan was administered prior to the acquisition. The 1993 Resolution also states that "all such Plans shall be deemed to be amended to reflect the foregoing resolutions, effective as of the date of the Acquisition" and authorizes "the officers of the Corporation

... to execute all such documents and to take all such action as such officers may deem necessary or appropriate in connection with those resolutions."

The plaintiffs argue that, by resolution dated April 19, 1994, the First Union Board established a "Human Resources Committee" of the Board of Directors. *See* Exhibit O to plaintiffs' reply to defendants' opposition to plaintiffs' motion for partial summary judgment with respect to Count I ("Resolution dated April 19, 1994").[3] In this resolution, the Board gives the Committee certain "powers and authority" including "(a) to review and make policy recommendations to the Board ... from time to time with respect to certain benefit plans for employees of the Corporation including, without limitation, the pension and savings plans...." The resolution also states: "All action by the Committee shall be reported to the Board of Directors for approval, ratification and confirmation in accordance with the foregoing provisions; provided however, that no rights or acts of third parties shall be affected by revision or alteration of any such action by the Board...."

In 1995, the First Union Board replaced the 1993 Resolution with a new resolution. The 1995 Resolution restates the first two preambles to the 1993 Resolution. It then authorizes the Human Resources Division, rather than the manager of the Human Resources Division, to "administer, operate, amend (subject to the approval of the Human Resources Committee of the Board of Directors of the Corporation), and otherwise deal with all such plans of any Acquired Company in accordance with the terms thereof, following consummation of the Acquisition relating thereto...." The 1995 Resolution adds a "new paragraph," one that does not appear in the 1993 Resolution, but which expressly delegates to the "proper officers" of the Human Re-

---

**3.** It is unclear to the Court whether or not this resolution "established" the Human Resources Committee, or whether the Committee already existed, as the 1993 Resolution suggests when it refers to such a Committee. It is not necessary for the Court to resolve this uncertainty.

sources Division the authority "to take any and all appropriate actions to implement the merger of the Plans of any Acquired Company into corresponding plans and trusts of [First Union]." Like the 1993 Resolution, it notes that to the extent a plan is required to be administered by a board, a committee of a board, and/or a trustee, then the plan shall be administered by the First Union counterparts. Also like the 1993 Resolution, it includes a statement that, upon the date a company was acquired by First Union, the acquired company's plans shall be deemed amended to conform to the "foregoing resolutions, effective as of the date of the Acquisition relating to such Plans" and that "the proper officers of [First Union] Corporation are hereby authorized to execute all such documents and to take all such action as such officers may deem necessary or appropriate in connection with the foregoing resolutions." Defendant's Summary Judgment Appendix, Tab 5, Exhibit B ("1995 Resolution").

### D. The Complaint

The Complaint, which contains five counts, alleges that each of the First Union defendants acted as a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), that each was a co-fiduciary of the others, ERISA § 405, 29 U.S.C. § 1105, and/or that each knowingly participated in the breaches of fiduciary duties of the others. It further alleges that each First Union defendant is liable pursuant to these statutes under each of the five counts. Count I alleges that Amendment 1997–2 was not adopted in accordance with the requirements of the Signet Plan and thus no merger ever occurred. Count II alleges, even assuming a valid Plan amendment, that the Signet Plan terminated and did not merge into the First Union Plan. Count III alleges that the Plan participants had a vested right to their past investment choices that could not be overridden by a valid Plan amendment. Count IV alleges that the First Union defendants breached their fiduciary duties in liquidating participants' investments in the Signet Plan and in discontinuing its non-proprietary investment options. Count V alleges that many of the participants received no or inadequate notice of the imminent radical changes to the Plan and their right to opt-out of those changes.

## II. LEGAL ISSUES

This matter is before the Court on the parties' various motions for summary judgment as to Counts I, II, III, and V. Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Counts I, II, III, and V are addressed herein.

### A. Count I

Plaintiffs argue that the purported amendment to the Signet Plan was not adopted in the manner required by the Plan and is therefore void. Plaintiffs rely on ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) (requiring that every employee benefit plan be "established and maintained pursuant to a written instrument") and ERISA § 402(b)(3), 29 U.S.C. § 1102(b)(3) (requiring that a plan must "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan") to support Count I.

Defendants argue that the Signet Plan prescribes neither the nature of the Board action required nor the timing of the action. Therefore, the defendants argue, citing recent Supreme Court case law, such action could include delegation of amendment authority to others and ratification as long as such action is permissible under corporate law. *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 85, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995); *Schoonejongen v. Curtiss–Wright Corp.,* 143 F.3d 120

(3rd Cir.1998). Defendants also argue that the Merger Agreement expressly contemplated the merger of the Plans and that the merger was approved by both Boards.

 Both the Signet Board and the First Union Board expressly approved the Merger Agreement and all amendments necessary to implement the merger, including specifically the merger of the employee benefit plans. There was appropriate Board action directly by each Board, through delegation of authority and, later, by ratification, all consistent with applicable corporate law. Accordingly, the defendants' motion for summary judgment as to Count I will be granted, the plaintiffs' motion for summary judgment as to Count I will be denied, and judgment will be entered on behalf of the defendants as to Count I.

The United States Supreme Court has stated that "principles of corporate law provide a ready-made set of rules for determining, in whatever context, who has authority to make decisions on behalf of a company." *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. at 80, 115 S.Ct. 1223. The Court explains that under corporate law principles, " '[A] corporation is bound by contracts entered into by its officers and agents acting on behalf of the corporation and for its benefit, provided they act within the scope of their express or implied powers.' " *Id.* at 81, 115 S.Ct. 1223 (quoting 2 William Meade Fletcher, *Cyclopedia of the Law of Private Corporations* § 466 (rev. ed.1990)). The Court also notes that amendment authority may be either "by express delegation or impliedly" and that, if the amendment "is found not to have been properly authorized when issued, the question would then arise whether any subsequent actions . . . served to ratify the provision ex post." *Id.* at 85, 115 S.Ct. 1223.

As described above, the Signet Plan states that "the Company, through action of the Board, reserves the right to amend, modify, suspend, or terminate the Plan." Signet Plan § 9.1. The Signet Board held a special meeting on July 18, 1997 and unanimously approved the terms of the Merger Agreement with First Union. The First Union Board approved the Merger Agreement at a special meeting on July 16, 1997. Despite plaintiffs' arguments to the contrary, the only reasonable interpretation of Section 6.13 of the Merger Agreement is that it specifically provided for the merger of the employee benefit plans "as soon as administratively practicable," so that the Signet employees would be moved into the First Union plan "as soon as administratively practicable" after the consummation of the merger on November 28, 1997 and, at that time, the Signet Plan would cease to exist.

At the same July 18 meeting, the Signet Board also approved two resolutions that specifically addressed employee benefit matters. The second expressly delegated authority to the Organization and Compensation Committee and "Authorized Officers" to take "all such actions . . . necessary or appropriate to implement the Employee Benefit Provisions." The Court finds that the language in the July 18, 1997 Signet Board resolution that approves "all of the amendments to the . . . Compensation and Benefit Plans as contemplated by the Merger Agreement and the related disclosure schedules as summarized in the attached terms sheets and disclosure schedule sections" constitutes the Board's approval of Amendment 1997–2. Amendment 1997–2 was without doubt an amendment contemplated by the Merger Agreement and the related disclosure schedules.

The minutes of the October 14 meeting of the Organization and Compensation Committee of the Signet Board and the October 25 meeting of the Signet Board both refer to actions taken by the Signet Board to facilitate the merger of the employee benefit plans and demonstrate the Board's clear intent that the Signet and First Union plans be merged as soon as possible after merger consummation.

On July 16, 1997, when the First Union Board approved the Merger Agreement, it also explicitly authorized officers of First Union, including Donald Johnson:

> to take any and all action which they may deem necessary or desirable to carry out the purpose and intent of the foregoing resolutions, and to make, execute and deliver, or cause to be made, executed and delivered, all agreements, undertakings, documents, instruments or certificates in the name and on behalf of the Corporation as they may deem necessary or desirable in connection therewith, including, without limitation, articles of merger and certificates of merger, and to perform, or cause to be performed, the obligations of the Corporation under the registration statements or any other agreement or document referred to herein.

("1997 Resolution"), Defendants' Summary Judgment Appendix, Tab 8. Johnson's execution of Amendment 1997–2 on December 9, which was authorized by the 1997 Resolution, effectuated the adoption of Amendment 1997–2.

About two months later, the First Union Board filed Form S–8 with the SEC to disclose the merger of the Signet and First Union Plans and the transfer of the stock held under the Signet Plan to the First Union Plan. This SEC filing was signed by a majority of the First Union Board. Defendants' Summary Judgment Appendix, Tab 12. The filing constitutes ratification of the merger of the plans and the Merger Amendment, and was consistent with First Union's long-standing policy of achieving uniform benefits for all of its employees.

Accordingly, the Court finds that both Boards expressly approved the Merger Agreement and all amendments necessary to implement the merger, including specifically the merger of the employee benefit plans and the Merger Amendment. There was also appropriate Board action through delegation of authority and, later, by ratification, all consistent with applicable corporate law. On that basis, the Court grants the defendants' motion for summary judgment as to Count I.

While the Court's ruling makes discussion of the 1995 Resolution academic, since the parties address at length its effect on the Signet Plan, the Court makes the following observations.

First, case law supports the defendants' position that the 1995 Resolution is valid. *See Elam Constr., Inc. v. Regional Transp. Dist.*, 129 F.3d 1343 (10th Cir. 1997) (self-executing resolution contingent on future action is effective); *Jordan v. SmithKline Beecham, Inc.*, 958 F.Supp. 1012 (E.D.Pa.1997) (same), *aff'd.*, 142 F.3d 428 (3d Cir.1998). Further, the Court disagrees with the plaintiffs' argument that the 1995 Resolution was not part of the Signet Plan because it was not incorporated or "folded into" it. *See Vogel v. American Home Products Corporation Severance Pay Plan*, 122 F.3d 1065, 1997 WL 577578, *5 (4th Cir.1997) (noting that "a plan need not be made up of one formal document").

■ Next, the Court rejects the plaintiffs' argument that the defendants' failure to produce the 1995 Resolution as an amendment to the Signet Plan in their response to some of the claims asserted by the plaintiffs under the First Union Plan's claims appeal procedures precludes the defendants from arguing that the resolution was a part of the Signet Plan. *See Gable v. Sweetheart Cup Company, Inc.*, 35 F.3d 851, 859 (4th Cir.1994) (holding that plaintiffs must show detrimental reliance to establish claim that amendment clause cannot be enforced due to nonreceipt of plan documents); *Aiken v. Policy Management Systems Corp.*, 13 F.3d 138, 141 (4th Cir. 1993).

Plaintiffs' other argument relates to the differences between the 1993 Resolution and the 1995 Resolution. The Court has already described the differences between the two resolutions. The Court disagrees with the plaintiffs' argument based on their comparison of the two resolutions.

The paragraph that the Court refers to as the "new paragraph," the paragraph that does not appear in the 1993 Resolution, but which expressly delegates to the "proper officers" of the Human Resources Division the authority "to take any and all appropriate actions to implement the merger of the Plans of any Acquired Company into corresponding plans and trusts of [First Union]," gives the "proper officers" of First Union the authority to amend the plans of acquired companies to implement the merger of those plans with the plans of First Union. Johnson's execution of the Merger Amendment constituted "appropriate action to implement the merger" of an acquired company plan into First Union's corresponding plan within the meaning of the 1995 Resolution as well as "action ... deem[ed] necessary or desirable to carry out the purpose and intent of the foregoing resolutions, and to make, execute and deliver ... all agreements ... [or] documents ... deem[ed] necessary or desirable in connection therewith ...." within the meaning of the 1997 Resolution.

Plaintiffs also argue that the consent signed by Mr. Jolley confirms that the Merger Amendment was not properly adopted by Mr. Johnson. The Court disagrees and accepts Mr. Jolley's testimony and affidavit in this regard.

Finally, even if the plaintiffs could establish a violation of the Signet Plan's amendment procedures, the Court agrees with the defendants that the circuit courts of appeal have held that procedural violations of ERISA § 402(b)(3) do not give rise to the substantive remedy of retroactive invalidation of plan amendments unless concealment, bad faith, or detrimental reliance exists. *See Vogel v. American Home Products Corporation Severance Pay Plan*, 122 F.3d 1065, 1997 WL 577578, *5 (4th Cir.1997) (quoting *Kreutzer v. A.O. Smith Corp.*, 951 F.2d 739, 743 (7th Cir. 1991) ("[T]he employer must have acted in bad faith, actively concealed the benefit plan, or otherwise prejudiced their employees by inducing their reliance on a faulty plan summary before recovery for procedural violations is warranted.")). Given

the facts in this case, where the employer clearly manifested its intent to amend the plan and at least attempted to disclose the amendment to the affected employees, even if there were a procedural violation, which the Court does not find, there was no bad faith or active concealment. Accordingly, the plaintiffs would be not be entitled to the remedy of retroactive invalidation.

## B. Count II

Count II alleges, even assuming a valid Plan amendment, that the Signet Plan terminated and did not merge into the First Union Plan. The defendants filed a motion for summary judgment as to Count II, claiming that Count II is inconsistent with the law and the facts and must be dismissed. The Court agrees with the defendants and, as discussed with regard to Count I, finds that there was a valid Plan amendment, that the two Plans were merged, and that the Signet Plan was not terminated. Accordingly, the defendants' motion for summary judgment as to Count II will be granted and judgment will be entered in favor of the defendants as to Count II.

▆ The cases discussed by the parties, including *Hickerson v. Velsicol Chem. Corp.*, 778 F.2d 365 (7th Cir.1985), the applicable Treasury Regulations, and the applicable Internal Revenue Code ("Code") sections demonstrate that the defendants are entitled to summary judgment on Count II. The law distinguishes between a merger of a plan and a termination of a plan. *Hickerson*, 778 F.2d at 378 (citing ERISA § 208, 29 U.S.C. § 1058 and the parallel Code § 414($l$)). Treasury Regulation § 1.414($l$)–1(d) expressly provides for the merger of defined contribution plans. It states:

> In the case of a merger of two or more defined contribution plans, the requirements of section 414($l$) will be satisfied if all of the following conditions are met:
>
> (1) The sum of the account balances in each plan equals the fair market

value (determined as of the date of the merger) of the entire plan assets.

(2) The assets of each plan are combined to form the assets of the plan as merged.

(3) Immediately after the merger, each participant in the plan as merged has an account balance equal to the sum of the account balances the participant had in the plans immediately prior to the merger.

Treas.Reg. § 1.414(*l*)–1(d). Treasury Regulations §§ 1.411(d)–2(a) and (d), which address termination of plans, state that complete termination occurs only by action of the plan sponsor or "complete discontinuance of contributions." The plaintiffs cannot show either. There is no contention that contributions were discontinued. There was also no action by either Board to terminate the Signet Plan. The reduction in the workforce and the enrollment requirement do not establish that a termination or partial termination of the Signet Plan occurred. Finally, there is no parallel provision in Title I of ERISA establishing vesting requirements for complete or partial plan terminations. Plaintiffs have no private cause of action to enforce the Code or the Treasury Regulations. *Reklau v. Merchants National Corp.*, 808 F.2d 628 (7th Cir.1986). Even if the plaintiffs could enforce these rules, they could get nothing more than what they have—full vesting of the accounts of the Signet Plan participants. A distribution cannot be forced because distribution is prohibited under Treasury Regulation § 1.401(k)–1(d)(3) ("A distribution may not be made under paragraph (d)(1)(iii) of this section if the employer establishes or maintains a successor plan.").

The Court also finds groundless the plaintiffs' claim that discrimination against former Signet Plan participants establishes that a termination took place. A merger transition period is necessary. The type of discrimination that the IRS looks for to determine a partial termination is discrimination in favor of highly-compensated employees prohibited under Code § 401(a)(4). There is no allegation that the merger somehow benefitted such employees which is the only type of discrimination relevant in this context. The claim as to reversion is also baseless in this context.[4]

For these reasons, the defendants' motion for summary judgment as to Count II will be granted and judgment will be entered in favor of the defendants as to Count II.

### C. Count III

Count III alleges that the Signet Plan participants had a vested right to their past investment choices that could not be overridden by a valid Plan amendment. The plaintiffs' motion for partial summary judgment as to Count III encompasses only the alleged breaches of fiduciary duty contained in Count III and does not encompass the allegations of Count III relating solely to the Capital One Stock Fund and its status as a Special Investment Fund. Nor does plaintiffs' motion encompass the allegations that First Union's conduct amounted to statutory violations of the anti-inurement clause and the prohibited transaction rules.

The defendants, in their motion for summary judgment as to Count III and their response to the plaintiffs' motion as to Count III, argue first that the statutory text of ERISA and the corresponding regulations are clear that investment alternatives are not "accrued benefits" that are protected under ERISA's "anti-cutback" rules from elimination through plan amendments. Next, they argue that ERISA § 404(c) and the regulations require that plan fiduciaries retain the right to change investment alternatives at any time. Third, defendants argue that the rules for construing ERISA plans require that the vesting of plan features be clearly

---

4. Some of the arguments made by the plaintiffs in support of Count II may support their position as to Count IV, which is still pending.

stated in the plan documents and that the plan fiduciary's interpretation of the plan language be upheld unless arbitrary and capricious. Finally, defendants argue that the language of the Signet Plan clearly states that the investment alternatives may be changed at any time by Plan amendment or by action of the Benefits Committee.[5]

Although plaintiffs do not argue that their investment choices are an "accrued benefit," the defendants discuss the rules addressing accrued benefits in their opposition to Count III. ERISA's "anti-cutback" rule prohibits plan amendments from reducing an "accrued benefit." ERISA § 204(g), 29 U.S.C. § 1054(g). The term "accrued benefit" is defined under ERISA as " . . . in the case of a plan which is an individual account plan, the balance of the individual's account." ERISA § 3(23)(1), 29 U.S.C. § 1002(23)(B). The regulations exclude from anti-cutback protection certain benefits:

> [t]he following benefits are examples of items that are not [ERISA § 204(g) ] protected benefits . . . (6) the right to direct investments; (7) the right to a particular form of investment (e.g., investment in employer stock or securities or investment in certain types of securities, commercial paper, or other investment media); . . . and (10) rights that derive from administrative and operational provisions, such as mechanical procedures for allocating investment experience among accounts in defined contribution plans.

Treas.Reg. § 1.411(d)–4(A–1)(d). This regulation shows a clear intent to exclude investment alternatives from ERISA's anti-cutback protection.

Both sides argue that ERISA § 404(c) supports their position on Count III. Plaintiffs argue that to construe the Plan the way the defendants do would have pre-vented the Plan from qualifying as a § 404(c) plan. Defendants argue that § 404(c) contemplates that those alternatives will be changed periodically. Section 404(c) states in relevant part:

> In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over assets in his account, if a participant or beneficiary exercises control over the assets in his account . . . no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control.

ERISA § 404(c), 29 U.S.C. § 1104(c). The regulations issued by the Department of Labor under this section state that a plan can qualify as a § 404(c) plan only if the plan: "(i) [p]rovides an opportunity for a participant . . . to exercise control over assets in his individual account . . . and (ii)[p]rovides a participant . . . an opportunity to choose, from a broad range of investment alternatives, the manner in which some or all of the assets of his account are invested . . . ." 29 C.F.R. § 2550.404c–1(b)(1). To satisfy the requirement of a "broad range of investment alternatives," the plan must allow the participant to choose from at least three investment alternatives, each of which is diversified, each of which has "materially different risk and return characteristics," which "in the aggregate enable the participant . . . to achieve a portfolio with aggregate risk and return characteristics at any point within the range normally appropriate for the participant," and each of which "when combined with investments in the other alternatives tends to minimize through diversification the overall risk of a participant's or beneficiary's portfolio." 29 C.F.R. § 2550.404c–1(b)(3)(B). The term

---

5. In their various memoranda with regard to Count III, the defendants do not specifically address the plaintiffs' Count III claims that are not included in the plaintiffs' motion for partial summary judgment—those relating solely to the Capital One Stock Fund and those allegations that First Union's conduct amounted to statutory violations of the anti-inurement clause and the prohibited transaction rules. Despite this failure, they ask the Court to grant summary judgment in their favor and dismiss Count III in its entirety.

"investment alternative" is defined as a "specific investment identified by a plan fiduciary as an available investment alternative under the plan." 29 C.F.R. § 2550.404c–1(e)(4). The plan fiduciary has a fiduciary obligation "to periodically evaluate the performance of such vehicles to determine, based on that evaluation, whether the vehicles should continue to be available as participant investment options." Preamble to DOL Reg. § 2550.404c–1, 57 Fed.Reg. 46906, 46924, note 27. Thus, the plan fiduciary has the responsibility for selecting investment alternatives and, by definition, has authority to remove alternatives.

██ The Signet Plan states that the investment alternatives may be changed.

> The Committee may add to or reduce the number and type of Investment Funds that will be available for investment in any Plan Year. The Committee shall select the Investment Funds in accordance with ERISA section 404(c) and the regulations thereunder. Special Investment Funds with respect to assets of plans that are merged into or transferred out of the Plan may be designated pursuant to an applicable Appendix. The Committee may limit the percentage of Participants' Accounts that may be invested in any one of the funds, and the Committee may establish rules relating to the investment of Accounts in the funds. The percentage investment in one or all of the Investment Funds shall be in whole percentages, beginning with 0% and ending with 100%.

Signet Plan § 8.3(b). Section 9.1 of the Signet Plan states specifically that "[a]ny amendment ... may not diminish the balances in the Accounts of any Participant or Beneficiary as they existed immediately before the effective date of the amendment." Section 11.3 of the Signet Plan describes what can happen in a situation such as a stock or asset sale:

> If substantially all of the stock or assets of an Employer or a division of an Employer are sold, the Accounts of Participants who are Employees of the affected Employer or division may be trans-

ferred to a tax-qualified defined contribution plan of the purchaser. If such a transfer is made, the Accounts of the affected Participants shall be transferred to a tax-qualified plan of the purchaser, and the affected Participants shall no longer be entitled to any benefits under this Plan.

Signet Plan § 11.3. The Signet Plan summary plan description ("SPD") is also consistent with the Plan, stating "[t]he Plan Administrator may add or reduce the number of investment funds in the future. In such event, you will be notified." The words "in the future" do not vest participant rights to investment options. *See Schoonejongen v. Curtiss–Wright Corp.*, 18 F.3d 1034, 1042 (3rd Cir.1994), *rev'd on other grounds*, 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) ("Even if the plan contained unambiguous assurances that all retirees would have health insurance benefits for life ... the general reserved right to amend the terms of the plan ... would render the right of any retiree or group of retirees terminable by adoption of a legally effective amendment."); *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 855 (4th Cir. 1994) ("Benefit descriptions cannot be translated into guarantees that benefits will never be altered, especially where, as here, the descriptions fall well short of the 'precise language denying the right to withdraw benefits' that courts require to find the creation of a vested right."). In addition, when "the summary plan description and the plan itself do not conflict, our cases provide no prohibition against review of the official plan itself for a fuller understanding of the plan's terms." *Hendricks v. Central Reserve Life Ins. Co.*, 39 F.3d 507, 512 (4th Cir.1994).

The other arguments regarding various provisions of the Signet Plan that the plaintiffs make in support of their motion for partial summary judgment are not persuasive. Specifically, the Court rejects plaintiffs' arguments regarding sections 6.2 and 8.1(b). Section 8.1 states: "Each Participant shall have the right to direct

investment of any or all of his Accounts subject to the requirements of Sections 8.2 and 8.3. . . ." Section 8.1(b) is thus expressly subordinated to the Committee's right to select Investment Funds under section 8.3(b). Neither is the Court persuaded by plaintiffs' arguments as to the Signet Plan Trust Agreement. The language in the Signet Plan shows that Signet did not intend to make and did not make past investment alternatives permanent vested features.

Further, the Fourth Circuit and other courts have consistently held that, in evaluating claims of vested benefits, ". . . because such an obligation constitutes an extra-ERISA commitment, . . . courts may not lightly infer the existence of an agreement to vest . . . benefits." *Gable*, 35 F.3d at 855. "Moreover, plaintiffs bear the burden of proving that their employer's ERISA plan contains a promise to provide vested benefits." *Id.*

Plaintiffs do not have a vested right to their past investment choices under the Signet Plan that could not be overridden by a valid plan amendment. For the reasons discussed above, the plaintiffs' motion for partial summary judgment as to Count III will be denied and the defendants' motion for summary judgment as to Count III will be granted in part and denied in part. The defendants' motion is granted as to the plaintiffs' claim that the Signet Plan participants had a vested right to their past investment choices that could not be overridden by a valid plan amendment and judgment will be entered on behalf of the defendants only to that extent.[6] The defendants' motion is denied as to the other Count III claims—those that were not included in the plaintiffs' motion

for partial summary judgment—specifically, those that relate solely to the Capital One Stock Fund and those allegations that First Union's conduct amounted to statutory violations of the anti-inurement clause and the prohibited transaction rules.[7]

### D. Count V

Plaintiffs have moved for partial summary judgment as to Count V.[8] Plaintiffs' amended motion for partial summary judgment seeks judgment for those former-employee participants with rollover rights who were shown as active employees on the records of the Signet Plan as of November 1, 1997 but who were not active employees as of November 21, 1997 and to whom, plaintiffs claim, defendants made no effort to send notice. Defendants oppose plaintiffs' partial summary judgment motion and have moved for summary judgment as to Count V in its entirety. Plaintiffs oppose the defendants' motion for summary judgment, arguing that there are genuine issues of material fact as to the remainder of Count V.

With regard to the motion for partial summary judgment, the plaintiffs argue that the defendants had a duty to provide notice concerning any change in fund options, that the defendants breached that duty with respect to all of the participants whom they call the "no-notice participants," and that the plaintiffs are entitled to summary judgment on liability and equitable relief.

Defendants argue that the only duty to disclose information regarding the merger is the duty established by ERISA § 104(b)(1) which requires that "a summary description of such modification or

---

**6.** This does not, however, foreclose plaintiffs' claims in Count IV that the defendants breached their fiduciary duties in liquidating participants' investments in the Signet Plan and discontinuing the non-proprietary investment options.

**7.** To the extent the Court grants defendants' motion for summary judgment as to Count III, the Court finds that the plain language of the Signet Plan forecloses any other conclu-

sion. Therefore, it is unnecessary for the Court to address the issue of the standard of review and the *contra proferentem* rule.

**8.** Plaintiffs withdrew their original motion for partial summary judgment with respect to Count V and submitted an amended motion for partial summary judgment as to Count V. It is the amended motion that the Court will address.

change shall be furnished [to participants] not later than 210 days after the end of the plan year in which the change is adopted." ERISA § 104(b)(1), 29 U.S.C. § 1024(b)(1).

Plaintiffs' position as to the defendants' duty to provide notice of the changes is based in part on the duty imposed by ERISA to administer a plan "in accordance with the documents and instruments governing the plan." ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Plaintiffs also rely on the defendants' fiduciary duties of "due care and loyalty" pursuant to ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

Plaintiffs note that the summary plan description ("SPD") of the Signet Plan specifically identifies all eight existing investment vehicles. The SPD also states:

> You will be provided information from time to time concerning the various investment funds. The Plan Administrator may add to or reduce the number of investment funds in the future. *In such event, you will be notified.*

Exhibit B to Complaint, SPD, at 4 (emphasis added). The SPD is "the statutorily established means of informing participants of the terms of the plan and its benefits." *Aiken v. Policy Management Sys., Corp.,* 13 F.3d 138, 140 (4th Cir.1993). The SPD is the "employee's primary source of information regarding employment benefits." *Id.* The SPD must be furnished to all participants and must provide them with an "accurate and comprehensive" statement of their rights and obligations in "a form and manner" that can be "understood by the average plan participant." ERISA § 102(a)(1), 29 U.S.C. § 1022(a)(1).

In addition to the binding promise in the SPD to notify the participants of changes in the investment funds, many courts interpreting the duties of ERISA fiduciaries have held that various sections of ERISA require that plan participants be notified of changes in a plan's provisions and be given an opportunity after such notice to take action. *See, e.g., Bixler v. Central Pa. Teamsters Health and Welfare Fund,* 12 F.3d 1292, 1300 (3d Cir.1993) ("[the] duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful"); *Anweiler v. American Elec. Power Serv. Corp.,* 3 F.3d 986, 991 (7th Cir.1993) ("[f]iduciaries must also communicate material facts affecting the interest of beneficiaries ... even when he or she does not [ask for such information].").

In *Rodriguez v. MEBA Pension Trust,* 872 F.2d 69 (4th Cir.1989), the Fourth Circuit recognized precisely this duty. The case involved the amendment of a pension plan that gave re-employed pensioners the option to suspend their pension checks during reemployment and accrue further benefits. Rodriguez, a pensioner who had resumed employment, was not given notice of this amendment, while other pensioners in the same situation were given such notice. When he learned of the amendment several years later, he requested the lost benefits, which the plan trustee denied. The Court of Appeals for the Fourth Circuit reversed the district court's grant of summary judgment for the trust. The opinion describes Congress' goals in enacting ERISA, to "protect ... participants in employee benefit plans ... by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto...." 872 F.2d at 73 (citing 29 U.S.C. § 1001(b)). It then discusses both the "specific disclosure requirements" as well as the "broad fiduciary duties imposed on plan trustees ... to be exercised 'solely in the interest of the participants and beneficiaries.'" *Id.* at 74 (citing 29 U.S.C. § 1104).

> Courts have interpreted these provisions to require notice to plan participants of changes in a plan's provisions and an opportunity after such notice for the participant to take action. Plan participants should not lose pension benefits

through mistakes and misunderstandings. "Congress promulgated the fiduciary duty and other provisions of ERISA, ... to ensure that plan participants would receive effective notice of any plan changes that might affect their pension rights...." Application of an overriding fiduciary standard of fairness was Congress' goal because it was "grossly unfair to hold an employee accountable for acts which disqualify him from benefits, if he had no knowledge of these acts...."

*Id.* at 74 (citations omitted).

The other argument plaintiffs make is based on a line of cases that hold that a fiduciary may not materially mislead those to whom ERISA § 404(a)'s duties of loyalty and expert due care are owed. *Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) is the most recent United States Supreme Court case that so holds. "To participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act 'solely in the interest of the participants and beneficiaries.'" *Id.* at 506, 116 S.Ct. 1065.

The parties do not agree on the current position of the United States Court of Appeals for the Fourth Circuit, given what may appear to be a conflict between the *Rodriguez* case and a later case, *Faircloth v. Lundy Packing Company,* 91 F.3d 648 (4th Cir.1996). However, the Court does not find a conflict. *Faircloth* addressed the scope of ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4). That section, which specifically addresses which "instruments under which the plan is established or operated" must be furnished "upon written request of any participant or beneficiary," was not at issue in the *Rodriguez* case and is not at issue in this case. While the Fourth Circuit declined to use § 404(a)(1)(A) to expand the specific duties imposed under § 104(b)(4) in *Faircloth,* the *Faircloth* decision does not preclude this Court from finding that the defendants' duty to provide notice of the merger, the changes in the investment alternatives, and the op-

tions available to the participants was broader than the duty imposed by § 104(b)(1) to provide information within 210 days after the end of the plan year.

■ The *Faircloth* decision discussed two situations in which fiduciaries must provide information beyond that required by ERISA § 104. The first is when the governing plan documents impose disclosure requirements on the fiduciaries beyond that required by the statute. Such is the case here. The individual investment funds were identified in both the Plan and the SPD. The SPD states that in the event the plan administrator adds to or reduces the number of investment funds, "you will be notified." Accordingly, based on the SPD, the defendants had a duty to give the plaintiffs timely and adequate notice of the merger, the changes in the investment alternatives, and the available options. The second situation discussed in *Faircloth* is when participants or beneficiaries allege that they have been misled by ERISA fiduciaries. In this case, a failure to provide the plaintiffs notice concerning the imminent changes to the Plan made information previously provided to Plan participants false and misleading. The cases requiring that fiduciaries not mislead participants demonstrate that the defendants herein had a duty to notify the plaintiffs of the changes in the investment funds in such a manner as to prevent any misinformation to and misleading of the plaintiffs regarding their options. Accordingly, the defendants had a duty to inform the plaintiffs of the changes in the investment funds in such a manner as to provide the plaintiffs the opportunity to make decisions regarding their options, as required by the regulations addressing § 404(c). *See* 29 C.F.R. § 2550.404c–1(b)(1) (a plan can qualify as a § 404(c) plan only if it provides "an opportunity for a participant to exercise control over assets in his individual account"). Thus, the notice had to be both timely and adequate to inform the plaintiffs of their options.

Considering both motions for summary judgment as to Count V against this legal framework, the Court finds that there are genuine issues of material fact so that neither motion can be granted. Accordingly, both plaintiffs' motion for partial summary judgment and defendants' motion for summary judgment as to Count V are denied.

An appropriate Order shall issue.

## ORDER

This matter is before the Court on plaintiffs' motions for summary judgment as to Counts I, III, and V, and defendants' motions for summary judgment as to Counts I, II, III, and V. For reasons stated in the accompanying Memorandum Opinion, the Court ORDERS as follows:

1. The Court GRANTS defendants' motions for summary judgment as to Counts I and II and ENTERS JUDGMENT on behalf of the defendants as to Counts I and II;

2. The Court GRANTS IN PART AND DENIES IN PART defendants' motion for summary judgment as to Count III. Defendants' motion for summary judgment is GRANTED as to plaintiffs' claim that Signet Plan participants had a vested right to their past investment choices that could not be overridden by a valid plan amendment. JUDGMENT WILL BE ENTERED on behalf of the defendants on Count III only to that extent. Defendants' motion for summary judgment is DENIED as to all remaining Count III claims, which are, accordingly, still pending;

3. The Court DENIES plaintiffs' motion for summary judgment as to Count I and plaintiffs' motion for partial summary judgment as to Count III;

4. The Court DENIES both plaintiffs' amended motion for partial summary judgment and defendants' motion for summary judgment as to Count V. Plaintiffs' original motion for partial summary judgment as to Count V was WITHDRAWN when the amended motion was filed.

Counsel are DIRECTED to contact the Court's Chambers and schedule a conference call with the Court to address any pending discovery motions and plaintiffs' motion for leave to file supplemental opposition to defendants' motion for summary judgment as to Count IV. Counsel should also be prepared to discuss during that conference call: (1) the status of all other pending motions; (2) setting a date for oral argument on the cross-motions for summary judgment as to Count IV; and (3) setting a trial date.

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.