**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MEDIKO, P.C.; DR. KAVEH OFOGH,
<u>Plaintiffs-Appellees,</u>

v.                                                                   No. 99-1768

LIBERTY HEALTHCARE CORPORATION,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, District Judge.
(CA-99-5)

Argued: February 28, 2000

Decided: April 13, 2000

Before LUTTIG and TRAXLER, Circuit Judges, and
G. Ross ANDERSON, Jr., United States District Judge
for the District of South Carolina,
sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Earle Duncan Getchell, Jr., MCGUIRE, WOODS, BAT-
TLE & BOOTHE, L.L.P., Richmond, Virginia, for Appellant. Brian
Hamrick Jones, KAESTNER, PITNEY & JONES, P.C., Richmond,
Virginia, for Appellees. **ON BRIEF:** John S. Barr, William H. Bax-
ter, II, Laura Clark McCoy, MCGUIRE, WOODS, BATTLE &

BOOTHE, L.L.P., Richmond, Virginia, for Appellant. Joseph W. Kaestner, KAESTNER, PITNEY & JONES, P.C., Richmond, Virginia, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

In this breach of contract action, Liberty Healthcare Corporation ("Liberty") appeals the district court's judgment entered in favor of Mediko, P.C. ("Mediko") and Kaveh Ofogh, M.D. ("Dr. Ofogh") after a bench trial. We affirm.

I.

Central State Hospital ("Central State"), a state psychiatric hospital located in Hopewell, Virginia, has a maximum security, inpatient forensic unit which provides psychiatric services to state prison inmates. In the summer of 1997, a Department of Justice investigation revealed overcrowding issues at the unit, prompting Central State Hospital to open a thirty-five person, satellite unit at the Riverside Regional Jail (the "Riverside Unit"), also in Hopewell, Virginia.

In November 1997, the Virginia Department of Mental Health, Mental Retardation, and Substance Abuse Services entered into a two-year, multi-million dollar contract with Liberty to provide health care services for Central State's forensic unit, including the Riverside Unit satellite. This controversy arises out of a two-year Subcontract Agreement (the "Agreement") which Liberty entered into with Dr. Ofogh and Mediko to provide healthcare services to the inmates at the Riverside Unit. Dr. Ofogh is the sole officer and employee of Mediko.

At the time that Liberty subcontracted with Dr. Ofogh, he was also employed part-time at the Lunenburg Correctional Center, where he

2

was scheduled to work between twenty and thirty hours per week. In the Agreement with Liberty, Dr. Ofogh similarly agreed to perform scheduled healthcare services at the Riverside Unit a minimum of three days per week and a maximum of twenty hours per week. He also agreed to be "on-call" for the Riverside Unit around the clock. In exchange, Dr. Ofogh was to be paid $120,000 per year for two years.

After the Agreement was signed, Central State issued"Hospital Instruction No. 5300.4" which required, effective January 1, 1998, that all new inmate-patients be assessed by a physician within eight hours of their admission. The origin of the eight-hour assessment policy, however, was the Department of Justice's Plan of Correction issued as a result of the investigation begun in the summer of 1997. It is undisputed that Dr. Ofogh knew nothing about this impending new policy when he entered the Agreement with Liberty. It also appears that Liberty was unaware of the impending change.

On June 9, 1998, Liberty sought to require Dr. Ofogh, pursuant to the new policy, to complete all new inmate-patient assessments at the Riverside Unit within eight hours of admission. Dr. Ofogh refused. An average of six to twelve new inmates arrived at the Riverside Unit each week at various times of the day and night and Dr. Ofogh claimed that the eight-hour assessment requirement constituted an additional duty that was neither contemplated nor required by his Agreement with Liberty. Liberty disagreed, and in September 1998, terminated Dr. Ofogh for his refusal to perform under the Agreement.

Dr. Ofogh's attempts to find substitute work failed and, in December 1998, he instituted this breach of contract action in the circuit court for the City of Hopewell, seeking the balance of the compensation due under the two-year Agreement. The action was removed to the district court on the basis of diversity of citizenship and a bench trial was conducted. The district court issued findings of fact and conclusions of law, ruling that the language of the Agreement did not require Dr. Ofogh to comply with the mandates of the new eight-hour assessment policy without additional compensation and, therefore, that Liberty breached the Agreement when it terminated Dr. Ofogh. Dr. Ofogh was awarded damages in the amount of the balance due under the Agreement. Liberty appeals.

3

II.

A.

The crux of Liberty's appeal is its assertion that the language of the Agreement required Dr. Ofogh to comply with the mandates of the new eight-hour assessment policy and that the district court erred in concluding otherwise. We review the district court's findings of fact for clear error and its conclusions of law de novo. See Hendricks v. Cent. Reserve Life Ins. Co., 39 F.3d 507, 512 (4th Cir. 1994); Scarborough v. Ridgeway, 726 F.2d 132, 135 (4th Cir. 1984). The parties agree that, pursuant to the terms of the Agreement, Pennsylvania law controls this contract dispute. Under Pennsylvania law, "[w]hen interpreting a contract, the court's paramount goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." Halpin v. LaSalle Univ., 639 A.2d 37, 39 (Pa. Super. Ct. 1994). If "the words used in a contract are ambiguous, [the] court may examine the surrounding circumstances to ascertain the intent of the parties." Id. However, if "the language of [the] writing is clear and unequivocal . . ., its meaning must be determined by its contents alone." Id.

"`[I]n construing [the] contract, each and every part of it must be taken into consideration and given effect, if possible, and the intention of the parties must be ascertained from the entire instrument.'" Bethlehem Steel Corp. v. Matx, Inc., 703 A.2d 39, 42 (Pa. Super. Ct. 1997) (first alteration in original) (quoting Marcinak v. Southeastern Greene Sch. Dist., 544 A.2d 1025, 1027 (Pa. Super. Ct. 1988)). Also, in ascertaining the intent of the parties, "`the court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished.'" Id. (quoting Village Beer & Beverage, Inc. v. Vernon D. Cox, Inc., 475 A.2d 117, 121 (Pa. Super. Ct. 1984)).

This case centers on two paragraphs in the Agreement which address the "medical services" that Dr. Ofogh was required to provide at the Riverside Unit. J.A. 161. Specifically, the Agreement provided that:

> [Dr. Ofogh] shall furnish coverage for the medical service of Forensic Unit for patients assigned by [Liberty]. . . . Said

4

services shall include but not be limited to performing physicals, providing medical consultations, attending to the medical needs of the Forensic Unit patients and other related duties as approved by [Liberty]. In addition, [Dr. Ofogh] agrees to provide a minimum of three (3) days per week (Monday through Sunday on-grounds at Forensic Unit), a maximum of twenty (20) hours total per week, during times as agreed upon and scheduled by [Liberty] and State for 156 days per year providing MD's medical services. . . .

Id. The Agreement also imposed an "on-call" requirement, stating that Dr. Ofogh must provide:

on-call coverage during all additional hours, seven days per week, 24 hours per day, 365 days per year. [Dr. Ofogh] shall respond to a Forensic Unit page by telephone within a reasonable amount of time which shall not exceed fifteen (15) minutes. If required by Staff at the Forensic Unit or medically indicated, [Dr. Ofogh] shall appear at the Forensic Unit on a timely basis given the circumstances.

Id. Finally, the Agreement provided that "[i]t is understood and agreed that the standards of professional practice and areas of responsibility of [Dr. Ofogh] from time to time shall be set by State or [Liberty]. [Dr. Ofogh] shall abide by the bylaws, rules and regulations of State." Id.

Liberty acknowledges that the eight-hour assessment policy would have constituted a substantial change in the medical services required of Dr. Ofogh by the Agreement, and that the Agreement perhaps turned out to be a "bad deal" for Dr. Ofogh. It contends, however, that this type of risk was nevertheless allocated to Dr. Ofogh by the broad language of the Agreement and that, in ruling otherwise, the district court impermissibly rewrote the contract in an attempt to reach a fairer result. In support of this contention, Liberty primarily points to (1) the "on-call" provision which provides that Dr. Ofogh must respond "[i]f required by Staff at the Forensic Unit or medically indicated . . . given the circumstances"; and (2) the language contemplating that "standards of professional practice and areas of responsibility" would be set by the Commonwealth or by Liberty

5

from time to time, and the accompanying requirement that Dr. Ofogh "abide by the bylaws, rules and regulations of[the] State." J.A. 161. We disagree.

First, in concluding that the Agreement did not cover this situation, the district court found "it impossible to square[Liberty's] construction with the intent of the parties," J.A. 127, because the eight-hour assessment policy did not exist when the Agreement was entered, neither party had reason to expect it, and the parties obviously contemplated that Dr. Ofogh would perform physicals and other routine services up to three days per week during "scheduled" hours, for a maximum of twenty hours per week. J.A. 127. To point out the unreasonableness of Liberty's position, the district court recognized that:

> [u]nder Liberty's construction, the Agreement required Dr. Ofogh to appear at Riverside not when "scheduled," but whenever it told him to be there. If a new inmate arrived at 8:00 a.m. one morning, then Dr. Ofogh had to show up and perform an examination before 4:00 p.m. If another inmate arrived at 10:00 p.m. that evening, then Dr. Ofogh would need to be back before 6:00 a.m. the next morning.

J.A. 127. "[D]eclin[ing] to find that the parties either expressly or implicitly agreed to such an arrangement," J.A. 127, the district court instead concluded that "[t]he term `scheduled' implie[d] that, as a general rule, Dr. Ofogh would be able to predict when he would have to be physically present at the jail." J.A. 127.

We, like the district court, believe this to be the most reasonable, probable, and natural interpretation of the parties' intent. See Bethlehem Steel Corp., 703 A.2d at 42. Indeed, the district court's example of the unreasonable nature of Liberty's proffered interpretation may well be an understatement. It presumes only two admissions in a twenty-four-hour period, whereas we can just as easily envision a situation in which Dr. Ofogh, depending upon when he was able to complete a new patient assessment, could be required to report to the unit multiple times in a twenty-four-hour period. As pointed out by the district court, the end result of Liberty's interpretation simply obliterates any meaning of the Agreement's reference to"scheduled" hours.

6

Second, the district court declined to interpret the "on-call coverage" requirement as intending to cover the situation presented by the new eight-hour assessment policy. Again, we agree with this conclusion. Read as a whole, the Agreement contemplated that physical assessments would be performed during the normal "scheduled" hours, not as an on-call or on-demand function. The "on-call" language, on the contrary, contemplates a need for Dr. Ofogh to appear to handle an urgent or other unusual situation that could not, in the interest of patient safety, be postponed until Dr. Ofogh's next scheduled appearance. Again, under Liberty's interpretation of the "on-call" provision, there would have been no reasonable bounds to Dr. Ofogh's duty to perform medical services, rendering the minimum days and maximum hours provision meaningless. Dr. Ofogh would have been obligated to appear at Riverside for any or no reason, at the whim of the Liberty staff, and to stay for as long as they demanded. Clearly, the language of the Agreement reveals that this was not the intent of the parties at the time of contracting.

Finally, the district court rejected Liberty's assertion that the eight-hour assessment policy falls under the Agreement's language directing Dr. Ofogh to abide by the Commonwealth's "bylaws, rules, and regulations" and "standards of professional practice and areas of responsibility" that might be set from "time to time." J.A. 161. As noted by the district court, these terms are not defined by the Agreement and, construing the contract as a whole, we agree that the parties did not intend that the quoted language would encompass an eight-hour assessment policy adopted by Central State as a result of the Department of Justice's investigation and Plan of Correction.

B.

We next turn to Liberty's contention that the district court erred in excluding evidence that Dr. Ofogh, during the Agreement negotiations, sought language limiting his on-call duties. We review the district court's decision to exclude evidence for abuse of discretion. See Martin v. Deiriggi, 985 F.2d 129, 137 (4th Cir. 1993).

During the trial, Liberty sought to cross-examine Dr. Ofogh with an exhibit reflecting his suggested changes to the proposed Agreement. One such suggested change consisted of Dr. Ofogh's attempt

to limit the "on-call" requirement to those calls which he believed, "in [his] sole medical judgment," necessitated his presence. J.A. 181. The district judge refused to allow the cross-examination, ruling that it was not pertinent to the question of whether the"on-call" provision, as ultimately agreed to, was intended to apply to the performance of routine physical assessments.

We find no abuse of discretion in the district court's decision to refuse the evidence. Like the district court, we fail to see how the proposed change is pertinent to the issue of whether the parties intended the "on-call" provision to apply to a staff member's demand, brought about by a new hospital policy, that Dr. Ofogh perform a routine physical assessment within eight hours of an admission. Additionally, even if the district court erred in excluding the evidence, the assumed evidentiary error was harmless. See Taylor v. Virginia Union Univ., 193 F.3d 219, 235 (4th Cir. 1999) (en banc), cert. denied, 68 U.S.L.W. 3433 (U.S. Feb. 28, 2000) (No. 99-1092) (applying harmless error analysis to civil case). Under a harmless error analysis, "we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." United States v. Heater, 63 F.3d 311, 325 (4th Cir. 1995) (internal quotation marks omitted). We are satisfied that the proposed change to the Agreement, sought to be introduced during the cross-examination of Dr. Ofogh, would have had no effect upon the findings and conclusions of the district court in this non-jury matter.

III.

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

8