**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 12-6831**

_____

UNITED STATES OF AMERICA,

               Petitioner - Appellee,

     v.

CARLOS OFARRIT-FIGUEROA,

               Respondent - Appellant.

_____

Appeal from the United States District Court for the Eastern
District of North Carolina, at Raleigh.  Terrence W. Boyle,
District Judge.  (5:10-hc-02022-BO)

_____

Argued:  May 17, 2013             Decided:  July 17, 2013

_____

Before KEENAN and FLOYD, Circuit Judges, and Henry E. HUDSON,
United States District Judge for the Eastern District of
Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED:** Eric Joseph Brignac, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Raleigh, North Carolina, for Appellant.  Michael
Gordon James, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh,
North Carolina, for Appellee.  **ON BRIEF:** Thomas P. McNamara,
Federal Public Defender, G. Alan DuBois, Assistant Federal
Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh,
North Carolina, for Appellant.  Thomas G. Walker, United States
Attorney, Jennifer P. May-Parker, Assistant United States
Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North
Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Carlos Ofarrit-Figueroa ("Ofarrit-Figueroa") appeals his civil commitment as a sexually dangerous person under the Adam Walsh Child Protection and Safety Act of 2006 ("the Act"). 18 U.S.C. § 4248. Following an evidentiary hearing, the district court found that Ofarrit-Figueroa had previously engaged, or attempted to engage, in sexually violent conduct; that he suffered from paraphilia not otherwise specified with exhibitionist features, a serious mental illness, abnormality or disorder; and that Ofarrit-Figueroa would have serious difficulty in refraining from engaging in sexually violent conduct as a result of a serious mental illness, abnormality or disorder. The district court committed Ofarrit-Figueroa to the custody of the Attorney General under 18 U.S.C. § 4248.

On appeal, Ofarrit-Figueroa challenges his commitment contending that the district court clearly erred in two of the requisite findings under the Act. He contends that the district court diagnosed him with a mental disorder unsupported by the expert opinions offered at the hearing. He also maintains that the district court failed to connect its finding of substantial

3

difficulty in refraining from sexually violent conduct to its finding of a serious mental disorder.[1]

The Adam Walsh Child Protection and Safety Act of 2006, 18 U.S.C. § 4247-48 provides for the civil commitment of a sexually dangerous person following the expiration of their federal prison sentence. 18 U.S.C. § 4248(a). A person is deemed to be sexually dangerous under the Act if he or she has "engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). A person is considered "sexually dangerous to others" if "the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). Commitment under the Act requires these findings by clear and convincing evidence. 18 U.S.C. § 4248(d).

Ofarrit-Figueroa is presently 55 years old. He was born in Havana, Cuba in 1957 and migrated to the United States as part of the Mariel boat flotilla. (J.A. 260-61.) Prior to his

---

[1] Ofarrit-Figueroa also argues that 18 U.S.C. § 4248 violates the Equal Protection Clause of the United States Constitution. As Ofarrit-Figueroa acknowledges in his brief, this Court previously rejected this challenge in United States v. Timms, 664 F.3d 436, 456 (4th Cir. 2012). Ofarrit-Figueroa offers no authority or argument which would compel this Court to revisit that decision.

arrival in the United States, Ofarrit-Figueroa was serving a ten year sentence for robbery in Cuba. (J.A. 74-75.) Ofarrit-Figueroa denied sexually deviant behavior, i.e., masturbating openly, during his confinement in Cuba, because he had two girlfriends and was allowed conjugal visits every 30 days. (J.A. 91-92.)

Soon after his arrival in Florida, Ofarrit-Figueroa was taken into custody by the Immigration and Naturalization Service and confined in various facilities, including the United States Penitentiary ("USP") in Atlanta, Georgia. In 1981, he was released on parole and relocated to New Jersey.

In 1982, while residing in New Jersey, Ofarrit-Figueroa sexually assaulted a woman at knifepoint and stole her purse. As a result of this incident, he was later charged with and convicted of robbery in the first degree, aggravated sexual assault in the first degree, possession of a weapon and possession of a weapon for unlawful purpose. (J.A. 79-80, 330, 359-60, 365-66, 407.)

However, prior to his conviction for rape and robbery in New Jersey, Ofarrit-Figueroa was found guilty in the State of Texas of armed robbery and was sentenced to five years imprisonment. (J.A. 80-82, 330.) Upon completion of this sentence, he was returned to the State of New Jersey to stand trial for the 1982 robbery, aggravated sexual assault and

5

weapons charges. Ofarrit-Figueroa was convicted on all four counts and sentenced to a total of 18 years imprisonment. While housed in the New Jersey correctional system, Ofarrit-Figueroa routinely masturbated in front of female correctional officers. At the evidentiary hearing in the immediate civil commitment proceeding, Ofarrit-Figueroa testified that he did this because he wanted the female officers to fall in love with him. (J.A. 81-82.)

In 1994, he was paroled into the custody of the Immigration and Naturalization Service. After being housed in a number of local facilities, he was transferred to the Federal Correctional Center ("FCC") in Terre Haute, Indiana, where he was assigned to work in the food service area. On March 22, 2000, Ofarrit-Figueroa struck, bit, kissed and sexually assaulted his female supervisor at that institution. When she attempted to summon help, Ofarrit-Figueroa knocked her radio from her hand. (J.A. 82-86, 330-31.)

As a result of the incident at FCC Terre Haute, Ofarrit-Figueroa was convicted of sexually assaulting and inflicting bodily injury on an employee of the Federal Bureau of Prisons ("BOP"). He was sentenced to ten years imprisonment and designated to the USP in Marion, Illinois. (J.A. 330-31, 358.) At USP Marion, he continued to expose himself and openly masturbate in the presence of female staff, often as an

6

expression of his anger. (J.A. 87, 89, 100.) In 2005, at his request, he was placed in the Sex Offender Management Program. However, because of his continuous sexual misbehavior, he was placed in a more secure special housing unit. (J.A. 343.) This was largely a result of his continued aggressive masturbation in the presence of female correctional officers he found attractive.

In the opinion of a staff psychologist at USP Marion, Ofarrit-Figueroa was deemed inappropriate for participation in a more intensive hypersexuality management program. The psychologist concluded that Ofarrit-Figueroa failed to accept responsibility for his actions, lacked motivation to change and had a defiant attitude toward disciplinary sanctions.[2] (J.A. 106.)

Ofarrit-Figueroa was eventually transferred to the BOP's most secure facility, the FCC in Florence, Colorado. He remained at that institution from 2006 to February 2010.[3] After a precertification evaluation for commitment as a seriously dangerous person under 18 U.S.C. § 4248, he was placed in a

---

[2] Ofarrit-Figueroa admitted refusing to obey orders and throwing feces at correctional officers. (J.A. 99–100.)

[3] Ofarrit-Figueroa was placed in secure and isolated status from 2000 through 2010, following his conviction for sexually assaulting a female officer. During that period, he had limited contact with BOP personnel or other inmates.

secure section of the Federal Correctional Institute ("FCI") in Butner, North Carolina (J.A. 337, 345.) At FCI Butner, Ofarrit-Figueroa was evaluated by a certification review board, composed of a number of mental health professionals.

During intake processing at FCI Butner, Ofarrit-Figueroa was initially evaluated by Dr. Andres Hernandez, the clinical coordinator of the commitment and treatment program at that facility. Ofarrit-Figueroa told Dr. Hernandez that women enjoyed having sexual intercourse with him and that he could not resist exposing himself while in prison. He further revealed to the psychologist that he believed that women who worked in prisons enjoyed observing inmates openly masturbating in their presence. (J.A. 109–11.)

The next mental health professional to come into contact with Ofarrit-Figueroa was Dr. Melanie Malterer, a sex offender program psychologist at FCI Butner. On May 28, 2010, Dr. Malterer observed Ofarrit-Figueroa exercising outside her window in a prohibited area. He was staring directly at her, shirtless, and appeared to have an erection. (J.A. 118.) Approximately one week later, an inmate reported to Dr. Malterer that Ofarrit-Figueroa was masturbating as she walked down the hallway. (J.A. 121–23.)

As a result, Ofarrit-Figueroa was placed in inmate segregation. This restricted confinement was extended after Dr.

Malterer learned from several inmates that Ofarrit-Figueroa referred to her as his girl and that she enjoyed watching him exercise outside her office. During his confinement in this annex area, Dr. Malterer, while conducting an evaluation of another inmate, observed Ofarrit-Figueroa place his penis through the cell door food tray and masturbate as he stared at her through a mirror he held in his hand. When Dr. Malterer directed him to stop masturbating, Ofarrit-Figueroa refused and exhorted that "now you have a reason to lock me up, bitch." (J.A. 123.)

As part of the certification evaluation process, Ofarrit-Figueroa was also evaluated by Dr. Dawn Graney, a sex offender forensic psychologist employed by the BOP. Dr. Graney testified that she diagnosed Ofarrit-Figueroa with exhibitionism, a paraphilia whereby individuals have recurrent and strong urges to expose themselves to nonconsenting strangers. Dr. Graney's clinical impressions also included a diagnosis of personality disorder/antisocial personality disorder. She elaborated that antisocial personality disorder is a pattern of serious rule violations or disregard for the rights or welfare of others. She added that both are mental disorders identified in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*, *Fourth Edition, Text Revision* (the "DSM"). (J.A. 55–56, 347, 349.)

9

Dr. Graney concluded that Ofarrit-Figueroa masturbated in front of nonconsenting individuals as a means of initiating sexual activity with women and that he also used this behavior to retaliate against or exhibit anger toward women. (J.A. 56–57.) In her view, unlike the typical exhibitionist, Ofarrit-Figueroa could be very intimidating and threatening. (J.A. 57.) As an example, she described him as "engaging in stalking behaviors or leering at female staff." (J.A. 61.) It was also her opinion that if faced with a woman who rejected his advances, he would engage in aggressive and threatening activity. (J.A. 60–61.) Based on psychological testing, Dr. Graney also testified that Ofarrit-Figueroa lacked volitional control, posed a high risk of sexually reoffending and would have serious difficulty in refraining from sexually violent conduct if he were to be released. (J.A. 63–64.)

The United States also called Dr. Hy Malinek, a clinical and forensic psychologist with offices in Beverly Hills, California. Dr. Malinek initially diagnosed Ofarrit-Figueroa with exhibitionism and antisocial personality disorder. Dr. Malinek, however, on further evaluation, revised his findings in a second supplementary report, to paraphilia not otherwise specified ("NOS") and antisocial personality disorder. (J.A. 131.) Dr. Malinek explained that the later diagnosis was more appropriate because Ofarrit-Figueroa possessed elements of

10

several serious disorders. He described Ofarrit-Figueroa as an atypical exhibitionist that did not fit squarely within this DSM diagnostic category because he desired to have sex with his victims. (J.A. 131–33.) Dr. Malinek noted that "[h]e fixates on people. He has committed two sexual -- two hands on sexual assaults. One is on a woman at the BOP at Terre Haute in Indiana." (J.A. 132.) Dr. Malinek also observed that Ofarrit-Figueroa possessed a distorted perception that women wanted to have sex with him and that his role is to "bring joy to the world [with his penis] and that this is appropriate behavior, there's nothing wrong with this . . . ." (J.A. 139.) Dr. Malinek added that this distorted perception "clearly amplifies his dangerousness." (J.A. 139.)

Based upon his evaluation, Dr. Malinek concluded that Ofarrit-Figueroa met the criteria for civil commitment under 18 U.S.C. § 4248. (J.A. 130.) In Dr. Malinek's view, Ofarrit-Figueroa's distorted thinking about his role with women and feelings of entitlement when combined with his antisocial personality disorder, make him sexually dangerous if rejected by a woman. (J.A. 149–53.)

The final expert witness was Dr. Luis Benjamin Rosell, called by Ofarrit-Figueroa. Dr. Rosell is a clinical and forensic psychologist with offices in Mount Pleasant, Iowa. Dr. Rosell testified that his evaluation did not reveal that

11

Ofarrit-Figueroa met the criteria for civil commitment under the Adam Walsh Act. In Dr. Rosell's opinion, Ofarrit-Figueroa would not have serious difficulty in refraining from sexually violent conduct. (J.A. 181-82.) Dr. Rosell rejected the notion that Ofarrit-Figueroa suffered from any paraphilia, particularly exhibitionism. Dr. Rosell identified several distinguishing features about Ofarrit-Figueroa's conduct. Most prominently, he exposed himself to individuals with whom he would have recurring contact. Atypically, he did not engage in exposure solely for shock value. Instead, Ofarrit-Figueroa was motivated by a desire to engage in sexual intercourse with the individuals to whom he exposed himself. (J.A. 183-85.)

Dr. Rosell diagnosed Ofarrit-Figueroa with antisocial personality but cautioned that he did not believe that it existed to a degree that would inhibit him in refraining from engaging in sexually violent conduct. (J.A. 182.) Dr. Rosell also disagreed that Ofarrit-Figueroa posed a high risk of sexually reoffending because, in Dr. Rosell's view, he had other opportunities to sexually offend while incarcerated but chose not to act on them. (J.A. 185.) Dr. Rosell also discounted Dr. Malinek's assessment that Ofarrit-Figueroa's sexual aggression was the product of anger. Instead, he believed that Ofarrit-Figueroa exposed himself in an effort to gain consensual intercourse. (J.A. 192-94.) Dr. Rosell did acknowledge,

12

however, that a number of his diagnostic tools revealed factors that increased Ofarrit-Figueroa's risk of sexual recidivism. (J.A. 202-04.)

In its findings of fact and conclusions of law, the district court found that the United States had demonstrated by clear and convincing evidence that Ofarrit-Figueroa met the criteria for commitment under 18 U.S.C. § 4248. The court initially noted that Ofarrit-Figueroa stipulated that he had engaged in sexually violent conduct in the past, as reflected by his criminal history.

In its analysis of the expert testimony, the court acknowledged disagreement as to the appropriate diagnosis of Ofarrit-Figueroa's mental illness. The court also observed that all three of the forensic psychologists agreed that Ofarrit-Figueroa's case was unique. The court attributed more weight to the testimony and findings of Drs. Malinek and Graney than that of Dr. Rosell. Both Drs. Malinek and Graney concluded that Ofarrit-Figueroa suffered from a serious mental illness, abnormality or disorder. However, neither found that his aggressive tendency to expose himself indecently, particularly when coupled with his desire to initiate sexual encounters, placed him squarely within any diagnostic label found in the DSM. The court therefore concluded that the evidence supported a finding of paraphilia NOS, which met the criteria for a mental

disorder under the Act. Specifically, the court credited Dr. Malinek's opinion, stating that:

> Mr. Ofarrit-Figueroa suffers from paraphilia NOS on the basis that he demonstrates paraphilic tendencies but does not "cleanly" meet the diagnostic criteria for exhibitionism. On that basis alone, the Court finds that Petitioner has met its burden to demonstrate by clear and convincing evidence that Mr. Ofarrit-Figueroa suffers from a serious mental illness, abnormality, or disorder.

(J.A. 303-04.)

Lastly, the court concluded that as a result of the illness, abnormality or disorder, Ofarrit-Figueroa would have serious difficulty in refraining from sexually violent conduct or child molestation if released. In drawing its conclusions on this element, the court relied on the teachings of United States v. Hall, 664 F.3d 456 (4th Cir. 2012). In Hall, the Fourth Circuit noted that

> the "serious difficulty" prong of § 4248's certification proceeding refers to the degree of the person's "volitional impairment," which impacts the person's ability to refrain from acting upon his deviant sexual interests. Kansas v. Hendricks, 521 U.S. 346, 358 (1997) . . . (noting that statutory requirements that couple proof of dangerousness with proof of a mental illness or abnormality "serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control").

664 F.3d at 463.

After recounting in detail the sexually aggressive conduct exhibited by Ofarrit-Figueroa during his confinement within the

14

BOP, his prior criminal history, and the findings of Dr. Malinek and Dr. Graney, the court concluded that "Ofarrit-Figueroa has demonstrated, even while incarcerated, a serious inability to refrain from acting upon his deviant sexual interests. It appears that he has found it particularly difficult to control his behavior."[4] (J.A. 304.)

The two central issues raised on this appeal are whether the district court properly anchored its finding of substantial difficulty in refraining from sexually violent conduct to its finding of a serious mental disorder. In addition, Ofarrit-Figueroa contends that the district court erred in adopting a mental diagnosis of Ofarrit-Figueroa unsupported by the expert testimony.

In cases in which the government seeks civil commitment of a convicted sex offender under the Walsh Act, this Court reviews the district court's findings for clear error and its legal conclusions de novo. United States v. Wooden, 693 F.3d 440, 451 (4th Cir. 2012). Under the clear error standard, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of

---

[4] During his confinement, Ofarrit-Figueroa was cited for fifty disciplinary infractions for sexually related conduct. (J.A. 99.)

fact, [we] would have weighed the evidence differently." Id. (quoting Anderson v. Bessemer City, 470 U.S. 564, 573-74, 105 S. Ct. 1504, 1511 (1985)) (internal quotation marks omitted). When the district court's findings "are based on determinations regarding the credibility of witnesses, we give even greater deference to the trial court's findings." Hall, 664 F.3d at 462 (quoting Anderson, 470 U.S. at 575, 105 S. Ct. at 1512).

Nevertheless, "while clear-error review is deferential, it is not toothless," and, therefore, we may set aside a district court's factual findings if the court failed to "properly tak[e] into account substantial evidence to the contrary" or its "factual findings are against the clear weight of the evidence considered as a whole." Wooden, 693 F.3d at 452, 454, 462 (citations and internal quotation marks omitted). Even so, we may find a district court's factual findings were clearly erroneous only if we are "left with the definite and firm conviction that a mistake has been committed." Id. at 451 (citation and internal quotation marks omitted).

Focusing first on the diagnosis by the district court, Ofarrit-Figueroa contends that it is unsupported by the expert testimony. He argues that the district court "fundamentally misunderstood Dr. Malinek's report and based its conclusion on that fundamental misunderstanding." (Appellant's Reply Br. 1.) According to Ofarrit-Figueroa, the district court erroneously

16

concluded that Dr. Malinek's diagnosis was paraphilia NOS, based on his exhibition-like tendencies. This Court disagrees with Ofarrit-Figueroa's characterization.

While Dr. Malinek discussed exhibitionism in explaining his diagnosis, Ofarrit-Figueroa points out that Dr. Malinek rejected this diagnostic label and concluded that he fit more squarely in the category of paraphilia NOS nonconsent. This was predicated on Ofarrit-Figueroa's interest in nonconsenting partners and his belief that indecent exposure was a vehicle intended to lure sexual partners. Dr. Malinek characterized his behavior as a "fundamental courtship disturbance." (J.A. 302.)

The district court prefaced its impression of the evidence by emphasizing that all three of the forensic psychologists who testified described Ofarrit-Figueroa's case as unique. The court further noted an apparent consensus among the experts that Ofarrit-Figueroa suffered from a serious mental illness, abnormality or disorder. The principle disagreement distilled to differences in diagnostic labeling. The behavior pattern demonstrated by Ofarrit-Figueroa was complex with manifestations that defied placement within the established diagnostic criteria contained in the DSM. In the final analysis, after thoroughly considering the contrary viewpoint of Dr. Rosell, the court

found Dr. Malinek's diagnosis and reasoning to be the most persuasive.[5]

In articulating its findings and conclusions, the district court found the evidence to best support the opinion of Dr. Malinek, namely that Ofarrit-Figueroa's "incidents of indecent exposure, boundary violations, stalking, leering, and following a particular staff member supported this diagnosis of paraphilia NOS." (J.A. 302.) The court explained that the nomenclature NOS was employed as a residual diagnostic category throughout the DSM as a classification of individuals whose behavior does not cleanly fit into specified diagnostic categories. (J.A. 302.) The court further explained that the nonconsent specifier used to describe Ofarrit-Figueroa's paraphilia NOS was driven by two independent bases. First, he met some but not all of the criteria for an exhibitionism diagnosis. Second, and perhaps more importantly, Dr. Malinek utilized the diagnosis specifier nonconsent to reflect Ofarrit-Figueroa's "anger and . . . need to denigrate women and empower himself." (J.A. 303.) Although the court expressed some reservation in embracing the nonconsent specifier, it found the explanation sufficient to support a

---

[5] Dr. Graney's conclusions paralleled those of Dr. Malinek in most respects, although she preferred a slightly different diagnostic label.

paraphilia NOS diagnosis and to meet the criteria for mental disorder under the Act.

The district court further concluded that Ofarrit-Figueroa demonstrated paraphilic tendencies but "does not 'cleanly' meet the diagnostic criteria for exhibitionism. On that basis alone, the Court finds that Petitioner has met its burden to demonstrate by clear and convincing evidence that Mr. Ofarrit-Figueroa suffers from a serious mental illness, abnormality, or disorder." (J.A. 303–04.) This Court finds no error in the district court's conclusions.

In reviewing petitions for civil commitment under the Adam Walsh Act, the science of psychiatry informs but does not control the court's ultimate legal determinations. Kansas v. Crane, 534 U.S. 407, 413, 122 S. Ct. 867, 871 (2002) (citations omitted). Moreover, the Act contains no "language purporting to confine the universe of qualifying mental impairments within clinical or pedagogical parameters." United States v. Caporale, 701 F.3d 128, 136 (4th Cir. 2012). Qualifying mental abnormalities can encompass conditions falling outside the DSM or other well-defined clinical standards. This is such a case.

Irrespective of diagnostic labeling, the evidence was clear and convincing that Ofarrit-Figueroa suffered from a serious mental illness, abnormality or disorder. The diagnosis of paraphilia not otherwise specified standing alone is sufficient

19

to satisfy the requirements of the Act. See United States v. Carta, 592 F.3d 34, 40 (1st Cir. 2010). It appears from the district court's findings of fact and conclusions of law that the addition of the phrase "with exhibitionist tendencies" are words of explanation rather than qualification. Although each of the psychologists testifying in this case concluded that Ofarrit-Figueroa's behavior was inconsistent with typical exhibitionism, each acknowledged that his indecent exposure was a critical diagnostic element. Given this behavioral characteristic, common to the findings of all experts, it was certainly understandable that the court added this descriptive language to its findings.

The district court was clearly guided by the content of the expert testimony, particularly that of Dr. Malinek and Dr. Graney, but was not obligated to accept their diagnostic labels. As the Supreme Court stressed in Kansas v. Hendricks, "[n]ot only do psychiatrists disagree widely and frequently on what constitutes mental illness, . . . but the Court itself has used a variety of expressions to describe the mental condition of those properly subject to civil confinement." 521 U.S. at 359, 117 S. Ct. at 2080 (citations and internal quotation marks omitted). At that stage of the analysis, the district court's task was to determine whether the evidence supported clearly and convincingly that Ofarrit-Figueroa suffered from a serious

20

mental illness, abnormality or disorder. The trial court's legal conclusions and factual findings were not clearly erroneous.

The final, and perhaps closer issue, is whether the district court adequately connected its finding of substantial difficulty in refraining from sexually violent conduct to its diagnosis of a serious mental disorder. This "prong of the § 4248's certification proceeding refers to the degree of the person's volitional impairment, which impacts the person's ability to refrain from acting upon his deviant sexual interests." Hall, 664 F.3d at 463 (citations and internal quotation marks omitted). It is a forward-looking inquiry which attempts to predict future behavior and the extent to which an inmate is controlled by his illness. United States v. Francis, 686 F.3d 265, 275 (4th Cir. 2012). As courts have recognized, this is the most challenging strand of the Act criteria for civil commitment.

The question of whether a person is "sexually dangerous" is "by no means an easy one," and "there is no crystal ball that an examining expert or court might consult to predict conclusively whether a past offender will recidivate." United States v. Shields, 649 F.3d 78, 89 (1st Cir. 2011). "Whether the individual is mentally ill and dangerous either to himself or others . . . turns on the meaning of the facts which must be

21

interpreted by expert psychiatrists and psychologists." Addington v. Texas, 441 U.S. 418, 429, 99 S. Ct. 1804, 1811 (1979) (emphasis in original). "In the end, however, it is for the factfinder to decide among reasonable interpretations of the evidence and determine the weight accorded to expert witnesses." Shields, 649 F.3d at 89 (citations and internal quotation marks omitted).

In reviewing the district court's findings on the volitional impairment prong, it is important to be mindful that "[e]valuating the credibility of experts and the value of their opinions is a function best committed to the district courts . . . . An appellate court should be especially reluctant to set aside a finding based on the trial court's evaluation of conflicting expert testimony." Hendricks v. Central Reserve Life Ins. Co., 39 F.3d 507, 513 (4th Cir. 1994).

The district court discounted the opinion advanced by Dr. Rosell as inconsistent with Ofarrit-Figueroa's demonstrated pattern of behavior. Dr. Rosell placed considerable weight on the fact that Ofarrit-Figueroa had not engaged in any sexually assaultive behavior in the years immediately preceding his evaluation. However, during almost that entire time period, Ofarrit-Figueroa was in segregated lockdown at a supermax facility isolated from other people.

In concluding that Ofarrit-Figueroa would have serious difficulty in refraining from engaging in sexually violent conduct as a result of serious mental illness, abnormality or disorder, the district court clearly considered and weighed the testimony of all three psychologists, reviewed the actuarial and psychological tests performed, and attached considerable weight to his troubling history of sexual deviance. In the district court's findings of fact and conclusions of law, as a predicate to its conclusions under this prong, the court detailed Ofarrit-Figueroa's sexually violent conduct, including committing a rape at knife point, sexually assaulting a correctional officer, and over forty incident reports since 1999 for behavior, including making sexual proposals or threats, engaging in sexual acts and indecent exposure.[6] (J.A. 304-05.)

In concluding that Ofarrit-Figueroa would have serious difficulty in refraining from sexually violent conduct if released, the district court carefully analyzed the actuarial instruments relied upon by the expert witnesses. Collectively viewed in light of Ofarrit-Figueroa's individual circumstances, the court found these actuarial assessment results to be

---

[6] As the United States Supreme Court recognized in Hendricks, "'previous instances of violent behavior are an important indicator of future violent tendencies.'" 521 U.S. at 358, 117 S. Ct. at 2080 (quoting Heller v. Doe, 509 U.S. 312, 323, 113 S. Ct. 2637 (1993)).

consistent with its conclusion that Ofarrit-Figueroa posed a high risk of recidivism. The precision with which the court linked the volitional component to a well-defined mental disorder, however, was necessarily governed by the inability of the experts to diagnostically capture Ofarrit-Figueroa's aberrant behavior.

As this Court has previously noted, the task of assessing the likelihood of future sexually violent conduct if Ofarrit-Figueroa is released, does not lend itself to scientific precision. The district court's findings represent a logical and reasonable interpretation of the evidence, and we cannot say that the district court clearly erred in finding that Ofarrit-Figueroa is sexually dangerous within the meaning of the Adam Walsh Act.

<u>AFFIRMED</u>

24